IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kenneth Scott Machado, )  No. CV 09-425-TUC-FRZ (HCE)
                      )
       Petitioner,    )  **REPORT & RECOMMENDATION**
                      )
vs.                   )
                      )
Chuck Ryan; et. al.,  )
                      )
       Respondents.   )
                      )
_____)

Pending before the Court is Petitioner Kenneth Scott Machado's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254 (Doc. 1).  Pursuant to the Rules of Practice of this Court, this matter was referred to the undersigned Magistrate Judge for Report and Recommendation. For the following reasons the Magistrate Judge recommends that the District Court dismiss in part and deny in part the Petition.

**I.     BACKGROUND**

   A.     State Proceedings

      1.     Conviction

A brief summary of pertinent portions of the record of pre-trial and trial proceedings follows.

Petitioner was charged with Sexual Assault, a class two felony (Count One); Administering Intoxicating Liquors/ A Narcotic Drug/ A Dangerous Drug, a class six felony

(Count Two); Attempted First Degree Murder, a class two felony (Count Three); Solicitation of a class one felony (Count Four); and Interfering With Judicial Proceedings, Domestic Violence, a class one misdemeanor. (Answer (Doc. 7), Exh. A).

> A.    State Proceedings

>> 1.    Conviction

A brief summary of pertinent portions of the record of pre-trial and trial proceedings follows.

The victim of the sexual assault was Petitioner's wife who married Petitioner in 1994. (Answer, Exh. E, p.5; Petition, Exh. B, p.2). The couple have two children together.[1] (Answer, Exh. E, p.5). In 2003, the couple separated, and the victim moved out of their residence and rented her own apartment. (*Id.* at p. 12). During the separation, the couple went to marriage counseling through their church. (*Id.* at p.11). As part of their counseling, the couple entered into an agreement wherein, *inter alia,* there would "be no forms of physical contact, i.e. holding hands, kissing, until mutually wanted by both..." parties and there would be no sexual contact. (*Id.* at pp. 14-15). During the separation, the victim, who retained her keys to the family home, would occasionally visit the family home, where Petitioner remained, to collect her belongings. (*Id.* at pp. 17, 76). During the separation, Petitioner and the victim shared a single checking account into which both of their paychecks were deposited. (*Id.* at p. 75). They shared expenses including those associated with the residence where Petitioner remained and the victim's apartment. (*Id.* at pp. 13, 55, 75-76). Petitioner and the victim shared custody of the children who would stay with one parent or the other depending on the day of the week. (*Id.* at p.12). The victim also went to the residence because it was easier for their son's speech therapist to at that location for therapy sessions. (*Id.* at p. 17).

Both the Petitioner and the victim worked as nurses. (*Id.* at pp. 7, 10). On December

---

[1]At the time of Petitioner's September 2004 trial, the children were six and four years of age. (Answer, Exh. E, p.5).

13, 2003, the victim went to Petitioner's home to study for an important nursing examination that she was to take the following day. (*Id.* at p. 19). The victim was nervous about the test, and Petitioner, who had taken the test previously, invited her to the home for dinner and to help her study while the children slept. (*Id.* at pp. 22-23). The victim testified that Petitioner told her that he would prepare an intravenous (hereinafter "IV") solution for her with dextrose and water to give her "energy to study...." (*Id.* at p. 27). During their separation, the victim had not gone to the home for dinner and she was hesitant about going on December 13, 2003. (*Id.* at p. 22). Nonetheless, the victim decided to go to Petitioner's home to help put their children to bed, study, and then return to her apartment. (*Id.*; *see also* (*Id.* at p. 27 ("because I had to start at 8:00 o'clock in the morning, I probably wanted be to be home around 10:00 o'clock to go home and get some sleep.")).

During dinner, the victim had two sodas, one of which Petitioner prepared outside her presence. (*Id.* at pp. 23-24). After dinner, the victim helped get the children to bed. (*Id.* at p.24). Once the children were in bed, Petitioner and the victim sat at the kitchen table while the victim studied for the examination. (*Id.* at pp. 25-26). After approximately, thirty minutes, Petitioner told the victim that he had a present for her and he presented her with a "little emerald ring" and a letter. (*Id.* at p.26). The victim testified that she told Petitioner "that I did not know what to say to him and he told me not to say anything....I tried to redirect to studying because that's why I came there." (*Id.*). Thereafter, Petitioner administered the IV to the victim at the kitchen table with the victim's permission. (*Id.* at pp. 29-30). The victim testified that she did not see Petitioner prepare the IV and its fluids. (*Id.* at p.29). The victim understood that the IV contained dextrose water. (*Id.*). After approximately ten minutes, the victim began to feel dizzy and light headed, asked Petitioner to stop the IV, and lost consciousness. (*Id.* at p. 30). The victim awoke briefly and found herself lying on Petitioner's bed unable to move and lost consciousness again. (*Id.* at pp. 31-32).

The victim testified that the next time she awoke, she was in the hospital emergency room. (*Id.* at p. 32; Petition, Exh. B, p. 3). Subsequent tests revealed that the victim's blood alcohol concentration was .20 and that she was suffering from benzodiazepine (Valium)

1  poisoning. (*Id.*). Hospital staff also found what was determined to be Petitioner's semen in

2  the victim's vaginal area. (*Id.*). Hospital staff informed the victim that Petitioner told them

3  she had overdosed. (Answer, Exh. E, p. 38).

4      At trial, Petitioner testified that prior to the victim's arrival at his home on December

5  13th, he and the victim had not discussed Petitioner administering an IV to her. (Answer,

6  Exh. I, pp. 30-31). Instead, the topic came up while the victim was studying at the kitchen

7  table when she told him she felt "a little headache coming on,..." and requested the IV. (*Id.*

8  at pp. 35-36). Petitioner "went and got all the things to do the I.V. on her and I brought them

9  to the kitchen table..." and he administered the IV to the victim. (*Id.* at pp. 35-38).

10  Approximately ten minutes later, the victim stated she did not "feel good...", Petitioner

11  "turned the I.V. off", and, upon the victim's request, walked her to the bedroom to lie down

12  while the IV bag was still attached to the victim. (*Id.* at pp. 38-39). In the bedroom, the

13  victim asked Petitioner to prepare her a drink and he made her a mixed drink, which the

14  victim sipped. (*Id.* at pp. 39-42). At some point, Petitioner "switched out" the IV from

15  "sugar water" to "normal saline...." (*Id.* at p. 41). In the bedroom, the victim began to cry,

16  Petitioner kissed her on the forehead, and the two engaged in sexual intercourse. (*Id.* at pp.

17  42-44). Afterwards, Petitioner went to the bathroom and when he returned, he found the

18  victim ironing her clothes and acting oddly. (*Id.* at pp. 45-46). Observing the victim have

19  what looked like a seizure, he led her to the bed to lie down and gave her a Valium. (*Id.* at

20  pp. 46-49). Petitioner left the victim lying on the bed. (*Id.* at p. 49). The bottle of Valium

21  was on the night stand next to the bed. (*Id.*). Petitioner later heard a noise from the bedroom,

22  "kicked in the door," and discovered the victim "purple and puked and not breathing." (*Id.*

23  at pp. 50-51). Petitioner performed CPR on the victim and called paramedics. (*Id.* at p. 51).

24      After the victim's release from the hospital, she and Petitioner met with their

25  marriage counselor to discuss the incident. (Answer, Exh. E at pp. 44-45). The victim

26  testified that after the meeting, she noticed Petitioner was following her. (*Id.* at p. 51-52).

27  The following day, December 19, 2003, the victim obtained an order of protection against

28  him. (*Id.* at pp.51-53). Despite the protective order, Petitioner visited the victim's apartment

1  on January 14, 2004, and left a letter and flowers in her vehicle. (Petitioner, Exh. B, p. 3).

2  The victim, called the police and reported Petitioner's violation of the protective order. (*Id.*).

3      Additionally, as summarized by the appellate court opinion:

4          In January 2004, [Petitioner] contacted Richard Corey, his cousin, and
5      asked him to help "get rid of" his wife. [Petitioner] told Corey he planned to
       rent a van and when his wife finished work on the morning of January 31, he
6      would shock her using an electroshock gun, put her in the van, and drive away.
       [Petitioner] asked Corey to pick up his wife's car after [Petitioner] had
7      abducted her. Corey said he would "think about it," but later mentioned
       [Petitioner's] plan to several people, including Corey's mother. His mother
8      warned [Petitioner's] wife her "safety was in danger," and [Petitioner's] wife
       called the police. On January 31, the day of the planned abduction,
9      [Petitioner] voluntarily committed himself to the psychiatric unit at Kino
       Hospital.
10         A police investigation ensued and subsequently showed [Petitioner] had
       purchased an electroshock gun on January 29. The police also discovered
11     [Petitioner] had rented a van and a hotel room during that same time period.
       A search of [Petitioner's] bedroom closet produced a bag containing the
12     electroshock gun, a stethoscope, instruction manuals, and batteries. [Petitioner]
       was arrested and charged with sexual assault, administering intoxicating
13     liquors or a narcotic or dangerous drug, attempted first-degree murder,
       solicitation of a class one felony, and interfering with judicial proceedings.

14  (Petition, Exh. B, pp. 3-4). The trial court directed a verdict on the count regarding

15  administering intoxicating liquors or a narcotic or dangerous drug, *i.e.* Count Two. (*Id.* at

16  p. 4). The jury acquitted Petitioner on the attempted first-degree murder charge but found

17  him guilty of the remaining counts. (*Id.* at p.4; *see also* Answer, Exh. K, pp. 14-16).

18      2.   Direct Appeal

19  Petitioner sought direct review of his conviction and sentences arguing that the:

20      1.   trial court erred "in denying [Petitioner's] request for a jury instruction on the

21          spouse defense to sexual assault, and/or the definition of 'spouse' and/or

22          'cohabitation,' thus denying [Petitioner] his constitutional right to present a

23          defense, his right to a jury, his right to due process to have a fair trial and to

24          have the elements proven beyond a reasonable doubt";

25      2.   trial court erred in failing to permit Petitioner to testify about his statement to

26          Detective Ridgeway and to allow Petitioner to call Detective Ridgeway as a

27          witness;

28      3.   the prosecution's "repeated characterization of its burden of proof as 'firmly

- 5 -

1    convinced,' was a fundamental error the prejudice of which was compounded

2    by the reasonable doubt jury instruction based on *State v. Portillo*"; and

3    4.    the imposition of presumptive consecutive sentences was an abuse of

4    discretion.

5  (Petition, Exh. A (Petitioner's Brief on Direct Appeal)) (all capitalization omitted).

6         On May 10, 2006, the Arizona Court of Appeals affirmed Petitioner's convictions and

7  sentences.  (Petition, Exh. B).

8         On February 9, 2007, the Arizona Supreme Court denied Petitioner's Petition for

9  Review.  (Petition, Exh. C).

10                    3.    Petition for Post-Conviction Relief

11        On October 16, 2007, Petitioner, through counsel, filed a Petition for Post-Conviction

12  Relief (hereinafter "PCR Petition").  (Petition, Exh. D).  Therein, Petitioner argued that:

13    1.    trial counsel was ineffective for failing to request that the Court instruct the

14    jury that, when deciding the sexual assault count, it could not consider

15    evidence that Petitioner criminally administered alcohol and/or drugs;

16    2.    trial counsel was ineffective for failing to raise several constitutional violations

17    related to the trial court's refusal to give a spousal defense jury instruction; and

18    3.    the trial court erred in denying Petitioner's request for a *Willits* instruction for

19    the lost IV bag.

20  (*Id*).

21        On January 31, 2008, the trial court denied Petitioner's PCR Petition. (Petition, Exh.

22  D).

23        On August 26, 2008, the Arizona Court of Appeals granted Petitioner's request for

24  review of the trial court's denial of his PCR Petition, but denied relief.  (Answer, Exh. B).

25        B.    Petitioner's Federal Petition for Writ for Habeas Corpus

26        On July 29, 2009, Petitioner filed the instant federal habeas petition.  Petitioner raises

27  the following claims:

28    1.    that his trial counsel was ineffective for failing to request a jury instruction that

the jury was not to consider "allegations..." that Petitioner administered alcohol and/or drugs to the victim without her knowledge (Petition, p. 6) (Ground I);

2.   Petitioner's right to due process under the Fifth Amendment was violated based upon: (a) the trial court's denial of his request for a jury instruction based on spousal defense to sexual assault "and not giving the jury the legal definition of 'spouse' and/or 'cohabitation'...."; (b) the trial court's granting of defense counsel's request that the jury not be instructed to disregard the charge that Petitioner administered drugs and/or alcohol without the victim's consent; and (c) the trial court's jury instruction on reasonable doubt, which according to Petitioner, relieved the State of its burden of proof "especially where the prosecution was allowed to argue to the jury that they 'only' had to be firmly convinced" to find him guilty.  (Petition, p.7) (Ground II).

Respondents concede that Petitioner's Petition is timely filed.   (Answer, p. 8).  Respondents assert that Petitioner's Petition should be denied on the merits and/or dismissed.

Petitioner filed a Reply to Respondents' Answer.  (Doc. 28).

## II.   STANDARD OF REVIEW

Because Petitioner filed his Petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) (hereinafter "AEDPA").

### A.   Exhaustion of State Remedies and Procedural Default

#### 1.   Exhaustion

A federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted the state court remedies available to him  28 U.S.C. § 2254(b); *Baldwin v. Reese,* 541 U.S. 27(2004); *Castille v. Peoples,* 489 U.S. 346 (1989).  The exhaustion inquiry focuses on the availability of state court remedies at the time the petition for writ of habeas corpus is filed in federal court. *See O'Sullivan v. Boerckel,* 526 U.S. 838 (1999).  Exhaustion generally requires that a prisoner provide the state courts an opportunity to act on his claims

1  before he presents those claims to a federal court.  *Id.*  A petitioner has not exhausted a claim
2  for relief so long as the petitioner has a right under state law to raise the claim by available
3  procedure.  *See* Id.; 28 U.S.C. § 2254(c).

4      To meet the exhaustion requirement, the petitioner must have "'fairly present[ed]' his
5  claim in each appropriate state court...thereby alerting that court to the federal nature of the
6  claim."  *Baldwin,* 541 U.S. at 29; *see also Duncan v. Henry,* 513 U.S. 364, 365-66 (1995).
7  A petitioner fairly presents a claim to the state court by  describing the factual or legal bases
8  for that claim and by alerting the state court "to the fact that the...[petitioner is] asserting
9  claims under the United States Constitution." *Duncan,* 513 U.S. at 365-66.  *See also Tamalini*
10 *v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001) (same).   Mere similarity between a claim raised
11 in state court and a claim in a federal habeas petition is insufficient.  *Duncan,* 513 U.S. at
12 365-66.

13     Furthermore,  to fairly present a claim, the petitioner "must give the state courts one
14 full opportunity to resolve any constitutional issues by invoking one complete round of the
15 State's established appellate review process."  *O'Sullivan,* 526  U.S. at 845.  Once a federal
16 claim has been fairly presented to the state courts, the exhaustion requirement is satisfied.
17 *See Picard  v. Connor,* 404 U.S. 270, 275 (1971).  In habeas petitions, other than those
18 concerning life sentences or capital cases, the claims of Arizona state prisoners are exhausted
19 if  they have been fairly presented to  the Arizona Court of Appeals either on appeal of the
20 conviction or through a collateral proceeding pursuant to Rule 32 of the Arizona Rules of
21 Criminal Procedure.  *Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir. 1999), *cert. denied*
22 529 U.S. 1124 (2000).  Thus, "a petitioner fairly and fully presents a claim to the state court
23 for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the
24 proper forum..., (2) through the proper vehicle..., and (3) by providing the proper factual and
25 legal basis for the claim...."  *Insyxiengmay v. Morgan,* 403 F.3d 657, 668 (9th Cir. 2005)
26 (citations omitted).

27     2.     Procedural Default
28     In some instances, a claim can be technically exhausted even though the state court

did not address the merits. This situation is referred to as "procedural bar" or "procedural default." *See Coleman v. Thompson,* 501 U.S. 722, 732 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."). A claim is procedurally defaulted if the state court declined to address the issue on the merits for procedural reasons such as waiver or preclusion. *Ylst v. Nunnemaker,* 501 U.S. 797, 802-05 (1991); *Franklin v. Johnson,* 290 F.3d 1223, 1230 (9th Cir. 2002). A higher court's subsequent summary denial reaffirms the lower court's application of a procedural bar. *Ylst,* 501 U.S. at 803.

Additionally, procedural default also occurs if the claim was not presented to the state court and it is clear the state court would now refuse to address the merits of the claim for procedural reasons. *Id.* Thus, if a claim has never been presented to the state court, a federal habeas court may determine whether state remedies remain available.[2] *See Harris v. Reed,* 489 U.S. 255, 263 n.9 (1989); *Franklin,* 290 F.3d at 1231. In Arizona, such a determination often involves consideration of Rule 32 *et seq.* of the Arizona Rules of Criminal Procedure governing post-conviction relief proceedings. For example, Ariz.R.Crim.P. 32.1 specifies when a petitioner may seek relief in post-conviction proceedings based on federal constitutional challenges to convictions or sentences. Under Rule 32.2, relief is barred on any claim which could have been raised in a prior Rule 32 petition for post-conviction relief, with the exception of certain claims[3] which were justifiably omitted from a prior petition.

---

[2]The Ninth Circuit has suggested that, under Ariz.R.Crim.P. 32.2, there are exceptions to the rule that a district court can decide whether state remedies remain available for claims that require a knowing, voluntary, and intelligent waiver. *See Cassett v. Stewart*, 406 F.3d 614 (9th Cir. 2005), *cert. denied,* 546 U.S. 1172 (2006). The issue of waiver must be affirmatively raised by the petitioner. *See Beaty v. Stewart,* 303 F.3d 975, 987 & n.5 (9th Cir. 2002), *cert denied,* 538 U.S. 1053 (2003).

[3]Such claims include: (1) that the petitioner is being held in custody after his sentence has expired; (2) certain circumstances where newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence; (3) the petitioner's failure to file a timely notice of post-conviction relief was without fault on his part; (4) there has been a significant change in the law that would probably overturn petitioner's conviction

1    Ariz.R.Crim.P. 32.2.  Moreover,  a state post-conviction action is futile when it is time-

2    barred.  *Beaty,* 303 F.3d at 987; *Moreno v. Gonzalez,* 116 F.3d 409, 410 (9th Cir. 1997)

3    (recognizing untimeliness under Ariz.R.Crim.P. 32.4(a) as a basis for dismissal of Arizona

4    petition for post-conviction relief, distinct from preclusion under Ariz.R.Crim.P. 32.2(a)).

5           Both of these instances of procedural default provide an independent and adequate

6    state-law ground for the conviction and sentence and thus prevents federal habeas corpus

7    review.  Accordingly, the procedural default doctrine prevents state prisoners from obtaining

8    federal review by allowing the time to run on available state remedies and then rushing to

9    federal court seeking review.  *Coleman,* 501 U.S. at 731-732 (1991).

10                                a.      Cause and Prejudice

11          A petitioner may be relieved from a procedural default on a showing of cause and

12   prejudice.  *Gray v. Netherland,* 518 U.S. 152, 161-162 (1996); *see also Murray v. Carrier,*

13   477 U.S. 478, 485-495 (1986); *Franklin*, 290 F.3d at 1231.  Generally, "cause" sufficient "to

14   excuse a default exists if the petitioner 'can show that some objective factor external to the

15   defense impeded counsel's efforts to comply with the State's procedural rule.'"  *Cook v.*

16   *Schriro,* 538 F.3d 1000, 1027 (9th Cir. 2008) (*quoting Murray,* 477 U.S. at 488).  Examples

17   of cause sufficient to excuse a procedural default include "'a showing that the factual or legal

18   basis for a claim was not reasonably available to counsel,' or that 'some interference by

19   officials' made compliance impracticable.'"  *Id.* (*quoting Murray,* 477 U.S. at 488).

20   Additionally, in certain circumstances, ineffective assistance of counsel may also constitute

21   cause sufficient to excuse a default.  *Id.* (*citing Edwards v. Carpenter,* 529 U.S. 446, 451

22   (2000); *Murray,* 477 U.S. at 488).

23          Prejudice is actual harm resulting from the constitutional violation or error.  *Magby*

24   *v. Wawrzaszek,* 741 F.2d 240, 244 (9th Cir. 1984).  To establish prejudice, a petitioner must

25

26   if applied to his case; and (5) the petitioner demonstrates by clear and convincing evidence
     that the facts underlying the claim would be sufficient to establish that no reasonable fact-
27   finder would have found petitioner guilty beyond a reasonable doubt. Ariz.R.Crim.P. 32.2(b)
28   (*citing* Ariz.R.Crim.P. 32.1(d)-(h)).

demonstrate that the alleged constitutional violation "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension." *United States v. Frady,* 456 U.S. 152, 170 (1982). If the petitioner fails to establish cause sufficient to excuse a procedural default, the court "need not consider whether he suffered actual prejudice." *Cook,* 538 F.3d at 1028 n.13.

b.    Fundamental Miscarriage of Justice

A habeas petitioner "may also qualify for relief from his procedural default if he can show that the procedural default would result in a 'fundamental miscarriage of justice.'" *Cook,* 538 F.3d at 1028 (*citing Schlup v. Delo,* 513 U.S. 298, 321 (1995)). This exception to the procedural default rule is limited to habeas petitioners who can establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup,* 513 U.S. at 327. *See also Murray,* 477 U.S. at 496; *Cook,* 538 F.3d at 1028. "'To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence–that was not presented at trial.'" *Cook,* 538 F.3d at 1028 (*quoting Schlup,* 513 U.S. at 324).

3.    Conclusion

In summary, failure to exhaust and procedural default/bar are different concepts. *Franklin*, 290 F.3d at 1230-1231. Under both doctrines, the federal court may be required to refuse to hear a habeas claim. *Id.* The difference between the two is that when a petitioner fails to exhaust, he may still be able to return to state court to present his claims there. *Id.* In contrast, "[w]hen a petitioner's claims are procedurally barred and a petitioner cannot show cause and prejudice for the default [or a fundamental miscarriage of justice]...the district court dismisses the petition because the petitioner has no further recourse in state court." *Id.* at 1231.

B.    Review of a Claim on the Merits

Pursuant to the provisions of the AEDPA, the Court may grant a writ of habeas corpus only if the state court proceeding:

- 11 -

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). Section 2254(d)(1) applies to challenges to purely legal questions resolved by the state court and section 2254(d)(2) applies to purely factual questions resolved by the state court. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004). Therefore, the question whether a state court erred in applying the law is a different question from whether it erred in determining the facts. *Rice v. Collins* 546 U.S. 333 (2006).

Section 2254(d)(1) consists of two alternative tests, i.e., the "contrary to" test and the "unreasonable application" test. *See Cordova v. Baca*, 346 F.3d 924, 929 (9th Cir. 2003). Under the first test, the state court's "decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003)(*citing Williams v. Taylor*, 529 U.S. 362, 413-14 (2000)). Additionally, a state court's decision is "'contrary to' Supreme Court case law if the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."[4] *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) (*quoting Early v. Packer*, 537 U.S. 3, 8 (2002)). "Whether a state court's interpretation of federal law is *contrary* to Supreme Court authority...is a question of federal law as to which [the federal courts]...owe no deference to the state courts." *Cordova*, 346 F.3d at 929 (emphasis in original)(distinguishing deference owed under the "contrary to" test of section (d)(1) with that owed under the "unreasonable

---

[4]"[T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412...While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark*, 331 F.3d at 1069 (emphasis in original).

- 12 -

1  application" test).

2       Under the second test, "'[a] state court's decision involves an unreasonable

3  application of federal law if the state court identifies the correct governing legal

4  principle...but unreasonably applies that principle to the facts of the prisoner's case.'" *Van*

5  *Lynn*, 347 F.3d at 738 (*quoting Clark*, 331 F.3d at 1067). Under the "unreasonable

6  application clause...a federal habeas court may not issue the writ simply because that court

7  concludes in its independent judgment that the relevant state-court decision applied clearly

8  established federal law erroneously or incorrectly...[r]ather that application must be

9  objectively unreasonable.'" *Clark*, 331 F.3d at 1068 (quoting *Lockyear v. Andrade*, 538 U.S.

10  63 (2003)). When evaluating whether the state decision amounts to an unreasonable

11  application of federal law, "[f]ederal courts owe substantial deference to state court

12  interpretations of federal law...." *Cordova*, 346 F.3d at 929.[5]

13       Further, a federal habeas court can only look to the record before the state court in

14  reviewing a state court decision under section 2254(d)(1). *Cullen,* __ U.S. at __, 131 S.Ct.

15  at 1400 ("If a claim has been adjudicated on the merits by a state court, a federal habeas

16  petitioner must overcome the limitation of §2254(d)(1) on the record that was before that

17  state court.")(footnote omitted); *Holland v. Jackson*, 542 U.S. 649, 652 (2004)("[W]e have

18  made clear that whether a state court's decision was unreasonable must be assessed in light

19  of the record the court had before it.")(citations omitted).

20       Under section 2254(d)(2), which involves purely factual questions resolved by the

21  state court, "the question on review is whether an appellate panel, applying the normal

22  standards of appellate review, could reasonably conclude that the finding is supported by the

23  record." *Lambert*, 393 F.3d at 978: *see also Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir.),

24

25       _____

26       [5]Section 2254(d) applies even where there has been a summary denial. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1402 (2011). In such circumstances, the petitioner can satisfy the "unreasonable application" prong of section 2254(d)(1) "only by showing that

27  'there was no reasonable basis for' the..." state court's decision. *Id.* (*quoting Harrington v.*

28  *Richter,* 562 U.S. __, 131 S.Ct. 770, 784 (2011)).

1   *cert. denied* 543 U.S. 1038 (2004)("a federal court may not second-guess a state court's fact-

2   finding process unless, after review of the state-court record, it determines that the state court

3   was not merely wrong, but actually unreasonable."). Section (d)(2) "applies most readily to

4   situations where petitioner challenges the state court's findings based entirely on the state

5   record. Such a challenge may be based on the claim that the finding is unsupported by

6   sufficient evidence,...that the process employed by the state court is defective...or that no

7   finding was made by the state court at all." *Taylor*, 366 F.3d at 999 (citation omitted). In

8   examining the record under section 2254(d)(2), the federal court "must be particularly

9   deferential to our state court colleagues...[M]ere doubt as to the adequacy of the state court's

10   findings of fact is insufficient; 'we must be satisfied that *any* appellate court to whom the

11   defect [in the state court's fact-finding process] is pointed out would be unreasonable in

12   holding that the state court's fact-finding process was adequate.'" *Lambert*. 393 F.3d at 972

13   (quoting *Taylor*, 366 F.3d at 1000)(emphasis in original).

14   Once the federal court is satisfied that the state court's fact-finding process was

15   reasonable, or where the petitioner does not challenge such findings, "the state court's

16   findings are dressed in a presumption of correctness, which then helps steel them against any

17   challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal

18   court."[6] *Taylor*, 366 F.3d at 1000: *see also* 28 U.S.C. §2254(c). Factual and credibility

19   determinations by either state trial or appellate courts are imbued with a presumption of

20   correctness. 28 U.S.C. §2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002);

21   *Bragg v. Galaza*, 242 F.3d 1082, 1078 (9th Cir. 2001), *amended* 253 F.3d 1150 (9th Cir.

22

23

---

24   [6]Under the AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. §2254(e). The "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error....Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once..." it is found that the state court reasonably determined the facts in light of the evidence presented in the state proceeding. *Taylor*, 366 F.3d at 1000.

1  2001). Furthermore, factual assertions made in support of properly exhausted claims in state
2  court cannot be altered or expanded upon without permission of the federal habeas court. *See*
3  *Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999).

4  Both section 2254(d)(1) and (d)(2) may apply where the petitioner raises issues of
5  mixed questions of law and fact. Such questions "receive similarly mixed review; the state
6  court's ultimate conclusion is reviewed under section 2254(d)(1), but its underlying factual
7  findings supporting that conclusion are clothed with all of the deferential protection
8  ordinarily afforded factual findings under §§ 2254(d)(2) and (e)(1)." *Lambert*, 393 F.3d at
9  978.

10  **III.   Analysis**

11          A.   Petitioner's request for an evidentiary hearing

12  In his Reply, Petitioner requests, for the first time, an evidentiary hearing pursuant to
13  28 U.S.C. §2254(e)(2). Section 2254(e) "substantially restricts the district court's discretion
14  to grant an evidentiary hearing" on a habeas claim. *Baja,* 187 F.3d at 1077. A liberal
15  reading of the Reply suggests that Petitioner requests an evidentiary hearing on a litany of
16  ineffective assistance of counsel claims with regard to several of the attorneys who
17  represented him during the course of the state proceedings. However, Petitioner's Reply
18  does not specifically address the claim of ineffective assistance of counsel raised in Ground
19  I of his Petition. Instead, Petitioner asserts claims of ineffective assistance of counsel on
20  factual predicates that were not raised in his federal Petition, or in the state proceeding. A
21  reply is not the proper pleading to raise additional grounds for relief. *See Cacoperdo v.*
22  *Demosthenes,* 37 F.3d 504, 507 (9th Cir. 1994); *Delgadillo v. Woodford,* 527 F.3d 919, 930
23  n.4 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed
24  waived."); *Woolridge v. Gonzales,* 2010 WL 1994874 (C.D. Cal. April 29, 2010) (declining
25  to consider arguments raised for first time in reply to petition for writ of habeas corpus).
26  Because the claims for which Petitioner requests an evidentiary hearing were not properly
27  raised in this proceeding, Petitioner's request for an evidentiary hearing should be denied.

28

1    B.    Ground I:    Ineffective affective assistance of counsel regarding failure to

2    request jury instruction

3         1.    The state court proceeding

4        In Count Two of the Indictment, Petitioner was charged with administering

5    intoxicating liquors and/or a narcotic drug and/or a dangerous drug to his wife. (Answer,

6    Exh. A).  After argument on Petitioner's motion for judgment of acquittal pursuant to

7    Ariz.R.Crim.P. 20 at the close of the Government's case, the trial court found no substantial

8    evidence to submit Count Two to the jury and directed a verdict of acquittal on that Count.

9    (Answer, Exh. H, p. 38; *see also* Answer, p. 10 ("because [the victim]...testified that she had

10   no memory of how she ingested the alcohol and benzodiazepine, the court directed a verdict

11   on that count.")).

12       Later, during the settlement of jury instructions, the prosecutor requested that the court

13   advise the jury "that Count Two for legal reasons will not be sent back to the jury for their

14   determination so they are aware of which one it was and that they are not going to be hearing

15   that and deliberate." (Answer, Exh. I, p. 178).  Defense counsel stated that he disagreed and

16   further stated: "I think they ought not to be told anything because once you start, I mean, they

17   kind of fuel the speculation once you make a comment on it, so my preference is either four

18   counts for your consideration and the instructions cover those four counts." (*Id.* at pp. 178-

19   179).  It was agreed that the jury would be advised that the State had charged Petitioner with

20   four counts, and the Court would omit reference to the crime charged in Count Two. (*Id.* at

21   p. 179).

22       In his PCR Petition, Petitioner argued that his trial counsel was ineffective for failing

23   to request an instruction advising the jury that they could not consider the State's allegations

24   against Petitioner with regard to Count Two. (Petition, Exh. D (PCR Petition, pp. 10-14)).

25   In denying Petitioner's PCR Petition, the trial court stated:

26       Defense counsel was presented with a dilemma following his successful
         advocacy which resulted in the granting of the motion for directed verdict as
27       to count one [sic]. He could request an instruction telling the jury to disregard
         the evidence related to that count, thus calling further attention to it.  Or he
28       could choose not to have such an instruction given.  Mr. Richard Jones was

- 16 -

counsel for defendant at trial.  He is an experienced and skilled criminal defense attorney.  It is apparent from the record that Mr. Jones considered the issue carefully, and chose to not request the instruction.  He said, "I think they ought not to be told anything because once your [sic] start, I mean, they kind of fuel the speculation once you make a comment on it...."  Trial transcript, p.179.  This is definitely trial strategy, and not ineffective assistance.

(Petition, Exh. D (January 31, 2008 order denying PCR Petition, pp. 1-2)).  The Court of Appeals affirmed the trial court as follows:

In a thorough, well-reasoned minute entry, the trial court denied relief on all claims [Petitioner] had raised in his petition for post-conviction relief. The court clearly identified the claims and resolved them correctly, permitting review by this or any other court.  *See State v. Swoopes,* 216 Ariz. 390, ¶47, 166 P.3d 945, 959 (App. 2007).  Although we see "no purpose in rehashing the court's order here" and "adopt its ruling", *id.*, we briefly state why [Petitioner] has not persuaded us the trial court abused its discretion by denying relief on the claims of ineffective assistance of counsel.

As the trial court correctly noted, [Petitioner] was required to establish that counsel's performance had been both deficient, based on prevailing professional norms, and prejudicial.  *See Strickland v. Washington,* 466 U.S. 668, 687 (1984).  Because a defendant must establish both elements of this test in order to be entitled to relief, the trial court need not consider the second if it finds the defendant has not sustained his burden as to the first.  *See State v. Salazar,* 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985).  "To avoid evaluating past conduct with the magnifying glass of hindsight, we evaluate counsel's performance in the context of the circumstances surrounding the offense and the prevailing professional norms in the legal community at the time" of the alleged ineffective assistance.  *State v. Ysea,* 191 Ariz. 372, 377, ¶16, 956 P.2d 599, 504 (1988).

In rejecting [Petitioner's claim]..., the trial court found counsel had made a tactical decision not to request the instruction so as not to call additional attention to the fact that [Petitioner] had also been charged with having given his wife intravenous drugs or alcohol before engaging in sex with her.  The court based that finding not only on the strong presumption that counsel's decisions were tactical or strategic, but on counsel's brief comments at trial as well. [Petitioner] has not established that the court abused its discretion in so concluding.

(Answer, Exh. B, pp. 4-5).

## 2.    Discussion

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court established a two-part test for evaluating ineffective assistance of counsel claims. To establish that his trial counsel was ineffective under *Strickland*, a petitioner must show: (1) that his trial counsel's performance was deficient; and (2) that trial counsel's deficient performance prejudiced petitioner's defense. *Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998)(*citing Strickland*, 466 U.S. at 688, 694).

1    To establish deficient performance, Petitioner must show that "counsel made errors

2   so serious...that counsel's representation fell below an objective standard of reasonableness"

3   under prevailing professional norms. *Strickland*, 466 U.S. at 687-688. The relevant inquiry

4   is not what defense counsel could have done, but rather whether the decisions made by

5   defense counsel were reasonable. *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).

6   In considering this factor, counsel is strongly presumed to have rendered adequate assistance

7   and made all significant decisions in the exercise of reasonable professional judgment.

8   *Strickland*, 466 U.S. at 690. The Ninth Circuit "h[as] explained that '[r]eview of counsel's

9   performance is highly deferential and there is a strong presumption that counsel's conduct

10  fell within the wide range of reasonable representation.'" *Ortiz*, 149 F.3d at 932 (*quoting*

11  *Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995)). "The reasonableness of counsel's

12  performance is to be evaluated from counsel's perspective at the time of the alleged error and

13  in light of all the circumstances, and the standard of review is highly deferential."

14  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Additionally, "[a] fair assessment of

15  attorney performance requires that every effort be made to eliminate the distorting effects of

16  hindsight, to reconstruct the circumstances of counsel's challenged conduct , and to evaluate

17  the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

18    Even where trial counsel's performance is deficient, Petitioner must also establish

19  prejudice in order to prevail on his ineffective assistance of counsel claim. To establish

20  prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's

21  unprofessional errors, the result of the proceeding would have been different. A reasonable

22  probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694;

23  Under the prejudice factor, "[a]n error by counsel, even if professionally unreasonable, does

24  not warrant setting aside the judgment of a criminal proceeding if the error had no effect on

25  the judgment." *Id.* at 691. Because failure to make the required showing of either deficient

26  performance or prejudice defeats the claim, the court need not address both factors where one

27  is lacking. *Id.* at 697-700.

28    It is well-settled that a defendant has the ultimate authority to make fundamental

decisions regarding whether to plead guilty, waive a jury trial, testify in his or her own behalf, or take an appeal. *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 (1977)(Burger, C.J. concurring). However:

> [no decision of the Supreme Court] suggests,...that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.

*Jones v. Barnes*, 463 U.S. 745, 751 (1983). To require otherwise would "seriously undermine[] the ability of counsel to present the client's case in accord with counsel's professional evaluation." *Id.* The professional judgment and evaluation every defendant is entitled to is an examination of the record, research of the law, and the marshaling of arguments on behalf of the defendant. *Douglas v. California*, 372 U.S. 353, 358 (1963).

Additionally, under the AEDPA, the federal court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 689-699 (2002). In order to merit habeas relief, therefore, Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*.  *See* 28 U.S.C. §2254(d)(1); *see also Cullen*, __ U.S. __, 131 S.Ct. at 1403 (federal habeas court's review of state court's decision on ineffective assistance of counsel claim is "doubly deferential."); *Harrington*, 562 U.S. at __, 131 S.Ct. at 788 ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."); *West v. Schriro*, 2007 WL 4240859, *7 (D.Ariz. Nov. 29, 2007).

The state court, in applying *Strickland,* applied the correct law to the issue.    In applying *Strickland,* the appellate court upheld the trial court's determination that defense counsel's decision was strategic or tactical, and did not constitute ineffective assistance of counsel.  (*Id.*).

"In determining whether the defendant received effective assistance of counsel, we

1   'will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of

2   hindsight,'...but rather we will defer to counsel's sound trial strategy."  *Murtishaw v.*

3   *Woodford,* 255 F.3d 926, 940 (9th Cir. 2001) (*quoting Strickland,* 466 U.S. at 688).  Further,

4   "'[b]ecause advocacy is an art and not a science, and because the adversary system requires

5   deference to counsel's informed decisions, strategic choices must be respected in these

6   circumstances if they are based on professional judgment.'" *Matylinsky v. Budge,* 577 F.3d

7   1083, 1091 (9th Cir. 2009) (*quoting Strickland,* 466 U.S. at 681).

8       The record is clear that defense counsel considered whether the instruction was

9   appropriate, and declined the instruction after determining that it would only "fuel the

10  speculation...."  (Answer, Exh. I, p. 179).  As Respondents point out, "[t]he suspicion that

11  Machado had administered these substances to [the victim] was clearly damaging to his claim

12  that the sex was consensual.  When the administering charge disappeared from the case, the

13  cloud it cast upon the consent issue diminished." (Answer, p.10).  If the instruction had been

14  given, then the jury would have been reminded about the charge that Petitioner unlawfully

15  administered alcohol and/or drugs to the victim before the sexual assault thus, as defense

16  counsel pointed, out "fuel[ing] the speculation...." (Answer, Exh. I, p. 179).  Instead, defense

17  counsel's decision to omit the instruction ensured that there would be no reminder about the

18  charge whatsoever.

19      Defense counsel weighed the plausible impact of the instruction on the jury and

20  exercised his professional judgment to make the strategic decision to decline the instruction.

21  On this record, Petitioner has not overcome the strong presumption that his counsel's

22  decision was sound trial strategy.  Consequently, the state court's decision on this issue was

23  not contrary to, or an unreasonable application of, *Strickland*  as determined by the United

24  States Supreme Court.  Nor did the state court's proceeding result in a decision that was

25  based on an unreasonable determination of the evidence presented.

26          3.      Recommendation

27      The Magistrate Judge recommends that the District Court deny Ground I on the

28  merits.

C.      Ground II: "Denial of Due Process" (Petition, p. 7)

Petitioner claims that he was denied his constitutional right to due process[7] when the trial court: (1) denied his request for a jury instruction on the spousal defense[8]; (2) granted defense counsel's request to omit instruction regarding Count Two; and (3) instructed the jury on reasonable doubt.

1.      Sub-claim 1:  Spousal defense

a.      The state court proceeding

Petitioner was indicted, *inter alia,* for sexual assault pursuant to A.R.S. §13-1406. At the time of Petitioner's trial,  A.R.S. §13-1407 provided, in pertinent part, that:

---

[7]In his Petition, Petitioner asserts that he was denied his right to due process under the Fifth Amendment of the United States Constitution.  It is the Fourteenth Amendment, not the Fifth Amendment that protects a person against deprivations of due process by a state.  *See* U.S. Const. amend XIV, §1 ("nor shall any State deprive any person of life, liberty, or property without due process of law."); *Castillo v. McFadden,* 399 F.3d 993, 1002 n.5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several States.").  The record is clear that Petitioner properly argued to the State Court that his Fourteenth Amendment due process rights were violated.  Further, Respondents have not challenged Petitioner's Ground II on this issue.

[8]Petitioner also asserts that: "[T]he possibility that one or more reasonable jurors could have interpreted the instruction requiring the prosecution to prove every element of the crime, *i.e.,* statutorily required proof of 'without consent'; 'immediate or threatened use of force'." (Petition, p.7).  The record reflects that Petitioner acknowledged that the State opted not to charge him with Sexual Assault of a Spouse under A.R.S. §13-1406.01, which has since been repealed, and which "would have required the State to prove not only that the act occurred 'without consent' of the spouse, by [sic] that such lack of consent be 'by the immediate or threatened use of force against the spouse....The State did not pursue an indictment on that basis because it reasoned it could not prove any 'immediate or threatened use of force' by..." Petitioner against his wife.  (Petition, Exh. A, (Petitioner's Brief on Direct Appeal, p. 23)).  Instead, the State charged Petitioner pursuant to A.R.S. §13-1406, "a statute that did *not* require it to prove any 'immediate or threatened use of force'" and under which Petitioner argued on direct appeal that he should have been permitted to present the spousal defense. (*Id.*) (emphasis in original).  Consequently, Petitioner's reference to the elements of A.R.S. §13-1406.01 a statute under which Petitioner was not charged, is not considered a separate claim herein but, instead, informs his argument challenging the trial court's denial of his request for a jury instruction on the spousal defense.

> It is a defense to prosecution pursuant to...[§] 13-1406 that the person was the
> spouse of the other person at the time of the commission of the act.

A.R.S. §13-1407(D).[9]  Arizona law defines a spouse as "a person who is legally married and cohabiting."  A.R.S. §13-1401(4).

During the settling of jury instructions, Petitioner requested the trial court to instruct the jury based on the spousal defense enunciated in A.R.S. § 13-1407(D).[10]  The State objected on the ground that Petitioner did not meet the definition of spouse in A.R.S. §13-1401(4).  (*See* Answer, Exh. I, pp. 159-173).  The appellate court correctly and succinctly summarized the proceedings before the trial court as follows:

> Both parties agreed that [Petitioner] and his wife were married at the time of the offense. The state argued, however, that, because [Petitioner] and his wife did not live in the same residence, they were not cohabiting, and thus, [Petitioner] could not be a spouse under §13-1401(4). [Petitioner] countered that whether two people were cohabiting is based on many factors other than just living together; therefore, this issue was a question of fact for the jury. The state responded that the court should first determine whether there were sufficient facts to support a finding that [Petitioner] and his wife had been cohabiting.  Without making any express findings, the court denied [Petitioner's] requested instruction.

(Petition, Exh. B, p.5).

On direct appeal, Petitioner argued that the trial court's ruling was an abuse of discretion and violated his due process rights under the Fourteenth Amendment.  (*See* Petition, Exh. A (Petitioner's Brief on Direct Appeal, pp.13-25)).  Petitioner argued "that whether two people are cohabiting can have 'various meanings and interpretations' and that the term is 'a flexible and broad one.'" (Petition, Exh. B, p.5).  The appellate court, after determining that the Arizona legislature did not "attach any special meaning or definition to..." the word "cohabiting" in section 13-1401(4), looked to dictionary definitions to hold

---

[9]A.R.S. §13-1407 has since been amended to repeal the spousal defense to sexual assault.  (*See* Petition, Exh. B, p. 5 n.1 (*citing* 2005 Ariz. Sess. Laws, ch. 185, §4)).

[10]Petitioner's requested instruction read: "It is a defense to prosecution of sexual assault that the person was the spouse of the other person at the time of the commission of the act."  (Answer, Exh. D).

that "the common meaning of the term 'cohabit' is a couple who is living together and behaving as married partners." (*Id.* at pp. 6-7). Relying on this definition, the appellate court rejected Petitioner's appeal as follows:

> [Petitioner] argues that the facts adduced at trial suggested he and his wife were cohabiting. He first notes he and his wife had been sharing the rent and mortgage payments at both residences and his wife's personal belongings had remained at the family residence. He also said his wife would visit the family residence and go for walks with their children. [Petitioner] further notes he and his wife were attending counseling and making attempts to reconcile.
>
> Although these facts may indicate an ongoing relationship, none demonstrates that [Petitioner] and his wife were cohabiting in the normal sense of the word. Furthermore, the record shows [Petitioner's] wife had moved out of the family residence and into a separate apartment three months before [Petitioner] assaulted her. And [Petitioner's] wife testified she had not engaged in any sexual activity with [Petitioner] since she had moved out. She further testified that the couple had drafted a separation agreement in which [Petitioner] had agreed not to ask for or attempt to have any physical contact with his wife. Because no evidence reasonably supported a finding that [Petitioner] and his wife were cohabiting, [Petitioner] was not entitled to the spousal defense instruction. Therefore, the trial court did not abuse its discretion in refusing to give one.

(*Id.* at p. 7). The appellate court reviewed Petitioner's claims of constitutional violations for fundamental error because he did not raise such claims below. (*Id.* at p.8 ("To prevail in a fundamental error review, a defendant must show that error occurred, the error was fundamental, and the error prejudiced the defendant.")). The court held that Petitioner was unable to establish fundamental error in light of its conclusion that the trial court did not error by refusing to give the spousal defense jury instruction.[11]  (*Id.*).

The Arizona Supreme Court denied Petitioner's Petition for Review on this issue.

---

[11]Although fundamental error is a concept that arises under Arizona state law, the Arizona Supreme Court has recognized that "'[i]t usually, if not always, involves the loss of federal constitutional rights.'" *State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991) (citation omitted). Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial."   *State v. Henderson,* 210 Ariz. 561,  567, 115 P.2d 601, 607 (2005) (citation omitted). The instant record reflects that in finding no fundamental error, the Arizona Court of Appeals necessarily considered the merits of Petitioner's claim, albeit pursuant to a higher standard.

1   (Petition, Exh. C). Thus, the appellate court's decision is the last-reasoned state court

2   decision on this issue.

3                                   b.      Discussion

4           In resolving Petitioner's claim, the Arizona court did not cite U.S. Supreme Court case

5   law. The U.S. Supreme Court has held that the state courts are not required to cite U.S.

6   Supreme Court cases nor are they required to have an *"awareness of our cases so long as*

7   neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537

8   U.S. at 8 (emphasis in original).

9           The Supreme Court of the United States "has held that '[a]s a general proposition, a

10  defendant is entitled to an instruction as to any recognized defense for which there exists

11  evidence sufficient for a reasonable jury to find in his favor.'" *Bradley v. Duncan,* 315 F.3d

12  1091, 1098 (9th Cir., 2002) (*quoting Mathews v. United States,* 485 U.S. 58, 63 (1988)).

13  Moreover, the failure to so instruct the jury may violate a petitioner's due process right to

14  present a full defense:

15          The Supreme Court has held: "Under the Due Process Clause of the Fourteenth
            Amendment, criminal prosecutions must comport with prevailing notions of
16          fundamental fairness. We have long interpreted this standard of fairness to
            require that criminal defendants be afforded a *meaningful* opportunity to
17          present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104
            S.Ct. 2528, 81 L.Ed.2d 413 (1984) (emphasis added).
18                  Thus, the state court's failure to correctly instruct the jury on the
            defense may deprive the defendant of his due process right to present a
19          defense.....This is so because the right to present a defense 'would be empty
            if it did not entail the further right to an instruction that allowed the jury to
20          consider the defense. *Tyson v. Trigg,* 50 F.3d 436, 448 (7th Cir. 1995).

21  *Id.* at 1098-1099. However, "[b]ecause an omitted instruction is less likely to be prejudicial

22  than a misstatement of the law, a petitioner seeking habeas relief based on a failure to give

23  a particular instruction bears an especially heavy burden." *Lamb v. Adam,* 2010 WL

24  5598523, *12 (C.D. Cal. Sept. 13, 2010) (*citing Henderson v. Kibbe,* 431 U.S. 145, 154

25  (1977); *Villafuerte v. Stewart,* 111 F.3d 616, 624 (9th Cir. 1997)).  Even where the failure to

26  give a jury instruction violates a petitioner's right to due process, "he may obtain habeas

27  relief only if the instructional error was not harmless, that is, had a substantial or injurious

28  effect or influence in determining the jury's verdict." *Id.* (*citing Brecht v. Abrahamson*, 507

1    U.S. 619, 637 (1993)); *see also Bradley,* 315 F.3d at 1099 (applying *Brecht* harmless error

2    standard to due process violation because the failure to instruct on the defense was a trial

3    error).

4         Key to the state court's analysis in Petitioner's case was the definition of "cohabiting"

5    as used in A.R.S. §13-1401(4).  This Court is bound by the Arizona court's interpretation of

6    its state law.  *See Holgerson v. Knowles,* 309 F.3d 1200, 1201 (9th Cir. 2005) ("The question

7    before us is not whether the California Supreme Court was correct.  We are bound by

8    California's interpretation of its state law.'); *Mendez v. Small,* 298 F.3d 1154, 1158 (9th Cir.

9    2002) ("A state court has the last word on the interpretation of state law.").

10        Once the Arizona appellate court determined the definition of  "cohabiting", it

11   examined the trial court's ruling in light of the evidence to conclude that "no evidence

12   reasonably supported a finding that [Petitioner] and his wife were cohabiting."  (Petition,

13   Exh. B, p.7).  Petitioner contends that the evidence supported a jury's application of the

14   spousal defense.   He argues that: during their separation, his wife had keys to the house,

15   came and went as she pleased, and received her mail there (Reply, p. 6 (*citing* Answer Exh.

16   G, pp. 13, 76-77, 118-119; Answer, Exh. E, p.76; Answer Exh. I, pp. 27-28)); Mr. Douglas

17   Lalime testified that the victim had told him she slept on the couch at the home one night (*Id.*

18   at pp. 5-6 (*citing* Answer, Exh. G,  p.95)); Petitioner and the victim had not filed for legal

19   separation   (*Id.* at p.6 n.6); the victim testified that she and Petitioner had one sexual

20   encounter during the separation period (*Id.* at p. 5 (*citing* Answer, Exh. E, p.18)); the victim

21   testified that she and Petitioner "were having 'sex, using condoms'" (*Id.* (*citing* Answer, Exh.

22   E, p. 95)) and "[o]n the evening of December 13, 2003, [the victim] and [Petitioner] had been

23   having more frequent contact, sexual contact, taking walks together, taking trips together,

24   and overall positive resumption of their marriage relationship."  (*Id.* at p. 7). Petitioner also

25   cites  the victim's testimony at trial that she and Mr. Lalime had sex during the separation.

26

27

28

1    (*Id.* at p. 5 n.5).  Petitioner opines that the victim's acceptance of his letter[12] and ring on

2    December 13, 2003 resulted in revoking their separation period.  (*Id.* at p. 25; *see also Id.* at

3    p. 17 (referring to the letter as a "reconciliation letter")).[13] In sum, Petitioner disagrees with

4    the state court's factual determination that he and the victim were not cohabiting under

5    Arizona law, *i.e.,* "a couple who is living together and behaving as married partners."

6    (Petition, Exh. B, p. 7).

7            The state court was not "required to address every jot and tittle of proof suggested to

8    [it]...nor..." was it required to "'make detailed findings addressing all the evidence before...'"

9    it.  *Taylor,* 366 F.3d at 1001 (*quoting Miller-El v. Cockrell,* 537 U.S. 322, 347 (2003)).  The

10   state court recognized that Petitioner and the victim were legally married at the time of the

11   offense and much of the evidence cited by the state appellate court is the same evidence

12   relied upon by Petitioner.  While the state court did not specifically state that the victim had

13   keys to the home or that she received mail there, the court acknowledged that her personal

14   belongings were at the home, she visited the home, and she would go for walks with the

15   children and Petitioner.  (*See* Petition, Exh. B, p.7).  Although the victim testified that before

16

17           [12]According to Petitioner, the letter was lost before his trial.  (Reply, p. 17).  Petitioner

18   testified that the letter informed the victim that he acquiesced to demands she had made and
     he offered her a ring "as a sign of our renewed vows, and she took the ring....She put it on."

19   (Answer, Exh. I, p.35).

20           [13]Petitioner also contends that at the "initial stage of [his] incarceration,..." his mother

21   recorded telephone conversations with the victim who told his mother, among other things,
     that "'we cohabitated' until the night of the alleged sexual assault,...."  (Reply, p. 11; *see also*

22   Reply, Exh. R10 (referring to recorded calls between the victim and Petitioner's mother

23   "[a]fter the trial....")).  Petitioner asserts that transcripts of the recordings exist as part of the
     record in Petitioner's and the victim's divorce proceeding. (Reply, p.12). Review of the

24   record supports the conclusion that the victim's alleged statement was not submitted in the

25   state proceedings relating to Petitioner's conviction. *See* 28 U.S.C. §2254(e)(2) (discussing
     consideration of new evidence in habeas proceeding); *see also Cullen,* __ U.S. __, 131 S.Ct.

26   at 1400. The Court need not determine whether such new evidence should be considered

27   herein because the victim's alleged *opinion* as to whether she and Petitioner had
     "cohabitated" until December 13, 2003, has nothing to do with the application of Arizona

28   law to the *facts* in evidence at trial on that issue.

she moved out she had stopped taking the birth control pill and, therefore, she and Petitioner used condoms (Answer, Exh. E, p. 19),  there is nothing in the record to suggest that they had sexual intercourse with or with condoms after she moved out and prior to the December 13, 2003 sexual assault of which Petitioner stands convicted.  Instead, the victim was clear that the last time she and Petitioner had intercourse was several weeks before she moved out. (*See id.* at pp. 18, 95).  Nor does the record reflect testimony from Petitioner, who testified in his own behalf, that he and the victim engaged in sexual intercourse after the victim moved out of the family home and prior to the night of December 13, 2003. (*See* Answer, Exh. I). Further, although the victim testified that Petitioner requested to and did perform oral sex on her during the early stages of the separation period, she also testified that the act made her feel uncomfortable and "pressured"  and resulted in the written agreement that, among other things, "there will be no forms of physical contact, *i.e.,* holding hands, kissing, until mutually wanted by both of us."  (Answer, Exh. E, pp. 14, 18; *see also id.* at p. 16 (the agreement was made "early on..." in the separation period)).  While there is testimony that the victim engaged in sexual intercourse with her co-worker and friend Mr. Lalime in early December, which was during the separation period, (*Id.* at p. 118)[14], there is no evidence in the record to support Petitioner's contention that he and the victim engaged in same during the separation period. Evidence that the victim minimally exchanged kisses with and/or engaged in sexual contact with a man other than her husband after she had moved out of the family residence and after she and her husband had ceased sexual relations, tends to support the conclusion that Petitioner and the victim were not "living together and behaving as married partners."  Further,  Mr. Lalime's testimony that the victim "might have mentioned that she slept on the couch" at the family home (Answer, Exh. G, p.119) does not undermine the state court's finding given the court's recognition that while the evidence "may indicate an ongoing relationship..." it did not "demonstrate[] that [Petitioner] and his wife were

---

[14]Although Mr. Lalime admitted to kissing the victim, he denied having sexual intercourse with her.  (Answer, Exh. G, pp. 115, 127).

1  cohabiting in the normal sense of the word." (Petition, Exh.B, p.7). Nor does Mr. Lalime's

2  reference to a trip Petitioner and his wife made to Las Vegas undercut the state court's

3  finding given that Mr. Lalime testified that he was uncertain whether the trip occurred before

4  or during the separation period. (Answer, Exh. G, pp. 119, 123). Moreover, the evidence

5  is equivocal that the victim's receipt of Petitioner's letter and the ring on December 13, 2003

6  altered the status of their separation in any way. The victim testified that upon receipt of the

7  letter and ring, she told Petitioner she "did not know what to say to him and he told me not

8  to say anything. That I didn't need to say anything." (Answer, Exh. E p.26). Thereafter, the

9  victim "tried to redirect to studying because that's why I came there." (*Id.*). Petitioner's

10  testimony about the victim's receipt of the letter was consistent with the victim's: Petitioner

11  testified that at the time he gave the letter and ring to the victim, there was no conversation

12  regarding the content of the letter; instead, the victim told him she did not know what to say

13  and he told her she didn't have to say anything. (Answer, Exh. I, p.35). Petitioner testified

14  that after he had administered the IV to the victim and she had fallen ill and laid down, she

15  mentioned "going to West Virginia and where we [sic] put the kids into school...." (*Id.* at

16  p.40). Petitioner believed that his marriage was "fixed...my wife had just come back to

17  me....I thought she was crying because of everything we had been through through the

18  separation...." (*Id.* at p. 43). The victim testified that once she began to feel ill, she was in

19  and out of consciousness. (Answer, Exh. E, pp. 31-33). The Petitioner's opinion that he and

20  the victim had reconciled, does not establish as fact that the two were "living together and

21  behaving as married partners." Further, "[w]hen an issue involves credibility of witnesses

22  and an evaluation of demeanor, there are 'compelling and familiar justifications for leaving

23  the process of applying law to fact to the trial court and according to its determination

24  presumptive weight.'" *Evans v. Raines,* 800 F.2d 884, 887 (9th Cir. 1986) (*quoting Miller

25  v. Fenton,* 474 U.S. 104, 106 (1985)). On the instant record, an appellate panel, applying

26  the normal standards of appellate review, could reasonably conclude that the state court's

27  finding is supported by the record. In sum, the finding of the state court herein is reasonable

28  based upon the evidence of record and has not been shown to be incorrect. *See* 28 U.S.C.

1   §2254(d)(2) & (e)(1).  *See Gonzalez v. Pliler,* 341 F.3d 897, 903 (9th Cir. 2003) ("Under

2   applicable federal habeas law, state court findings of fact are presumed correct unless

3   rebutted by clear and convincing evidence or unless based on an unreasonable evidentiary

4   foundation.").

5        According full deference to the state court's factual findings, the Court now turns to

6   the issue of whether the state court's conclusion as to the ultimate legal issue,  *i.e.* whether

7   Petitioner was entitled to the spousal defense under Arizona law, is contrary to or an

8   unreasonable application of, clearly established federal law.  *See Lambert,* 393 F.3d at 978

9   ("Fact-finding underlying the state court's decision is accorded the full deference of §§

10  2254(d)(2) and (e)(1), while the state court's conclusion as to the ultimate legal issue-or the

11  application of federal law to the factual findings-is reviewed per §2254(d)(1) in order to

12  ascertain whether the decision is 'contrary to, or involved an unreasonable application of,

13  clearly established' Supreme Court precedent.  28 U.S.C. §2254(d)(1)").

14       The Arizona court herein, consistent with Federal precedent, examined whether the

15  evidence reasonably supported a finding that Petitioner and his wife were cohabiting under

16  Arizona law and determined that because the evidence did not reasonably support such a

17  finding, Petitioner was not entitled to the spousal defense instruction.  *See Trombetta,* 467

18  U.S. at 485 (the Due Process Clause requires that  criminal defendants be afforded a

19  meaningful opportunity to present a complete defense); *Mathews,* 485 U.S. at 63 ("a

20  defendant is entitled to an instruction as to any recognized defense for which there exists

21  evidence sufficient for a reasonable jury to find in his favor").  As discussed *supra,* the state

22  court's findings are supported by evidence which showed that although Petitioner and the

23  victim had an ongoing relationship, they were not living together and behaving as married

24  partners at the time of the offense.  Therefore, the state appellate court's determination that

25  the refusal to give the spousal defense instruction did not violate Petitioner's constitutional

26  right to present a defense was neither contrary to, nor an unreasonable application of,

27  controlling Supreme Court precedent.  Nor did the state court's determination result in a

28  decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the state court.  Consequently, Petitioner is not entitled to federal habeas relief on this ground.

> 2.     Sub-claim 2:  Trial court's failure to instruct the jury regarding the dismissed charge

Petitioner's statement of his Ground II claim includes reference to denial of due process and the assertions that the prosecution's burden of proof was impermissibly eased and "erroneous jury instruction: 'Firmly Convinced.'" (Petition, p.7).  The supporting facts portion of Petitioner's Ground II contains several disjointed paragraphs.  (*See Id.* at p.7).  In the second paragraph, Petitioner states:

> As set forth in Ground One, trial counsel, Mr. Jones objected to the instruction, and the trial court failed to exercise its discretion to include said instruction, in spite of the court's directed verdict to acquit on Count II (administering alcohol/drugs).

(*Id.*).

Defense counsel's request that the court not refer to the dismissed charge during jury instructions is addressed *supra,* at III.B.  To any extent that Petitioner is attempting to argue that a due process violation resulted from the trial court's granting of defense counsel's request to omit reference to the dismissed charge in the jury instructions, any such claim is procedurally defaulted given that Petitioner did not raise the issue on direct appeal.  (*See* Petition, Exh. A, B).  Although Petitioner argued in his PCR Petition that defense counsel's decision to forego instruction on this issue constituted ineffective assistance, he did not argue that the trial court's decision to grant his own counsel's request violated the Due Process Clause of the U.S. Constitution.  (*See* Petition, Exh. D).  Therefore, Petitioner failed to fairly present his claim to the state court.  Moreover, Petitioner's return to state court to raise such a claim would be futile given that the claim is precluded as waived under Ariz.R.Crim.P. 32.2(a)(3) because it was not  presented on direct appeal or in Petitioner's PCR Petition. Further, presentation of such claim in a second post-conviction relief proceeding would be untimely under Ariz.R.Crim.P. 32.4.  *See Beaty,* 303 F.3d at 987 (a state post-conviction action is futile when it is time-barred). Nor does the claim qualify for any of the timeliness

1    exceptions.  *See* Ariz.R.Crim.P. 32.1(d)-(h).  Thus, any additional petition would be subject

2    to summary dismissal.  *See State v. Rosario,* 195 Ariz. 264, 266, 987 P.2d 226, 228 (App.

3    1999); *State v. Jones,* 182 Ariz. 432, 897 P.2d 734 (App. 1995); *Moreno v. Gonzalez,* 192

4    Ariz. 131, 135, 962 P.2d 205, 209 (1998) (timeliness is a separate inquiry from preclusion).

5    Under such circumstances, the claim is procedurally defaulted.[15]  *Park v. California,* 202

6    F.3d 1146, 1150-51 (9th Cir. 2000) (federal habeas review is precluded where petitioner has

7    not raised his claim in the state courts and the time for doing so has expired).  Petitioner has

8    not demonstrated cause and prejudice to excuse his procedural default.  Nor has Petitioner

9    presented any evidence that would sustain application of the "fundamental miscarriage of

10   justice exception" to the procedural default rule on this issue.

11                         3.       Sub-claim 3:  Reasonable doubt instruction

12          Petitioner claims that his due process rights were violated by the trial court's jury

13   instruction on reasonable doubt which utilized "firmly convinced" terminology resulting in

14   "impermissibly easing the prosecution's burden of proof."  (Petition, p. 7). Petitioner also

15   points out that, in light of  the court's instruction, the prosecution argued to the jury that the

16   jury "'only' had to be 'firmly convinced'" of his guilt.  (*Id.*).

17          The trial court instructed the jury as follows in pertinent part:

18                 The State has the burden of proving the defendant guilty beyond a
             reasonable doubt. In civil cases, it is only necessary to prove that a fact is more
19

20          [15]Because this claim is procedurally defaulted pursuant to Rule 32.4(a),
21   Ariz.R.Crim.P., this Court need not determine whether the claims are of "sufficient
     constitutional magnitude" to require a knowing, voluntary, and intelligent waiver such that
22   the claims are precluded pursuant to *Cassett*. Moreover, the procedural timeliness bar of Rule
     32.4(a), Ariz.R.Crim.P., is clear, consistently applied, and well established. *Powell v.*
23   *Lambert,* 357 F.3d 871 (9th Cir.2004); see e.g., *Rosario*, 195 Ariz. 264, 987 P.2d 226 (where
24   petitioner did not raise claims pursuant to Rule 32.1(d) through (g), the petition could be
     summarily dismissed if untimely); *Moreno*, 192 Ariz. 131, 962 P.2d 205 (timeliness
25   provision of Rule 32.4(a) became effective September 20, 1992); *Jones*, 182 Ariz. at 434,
26   897 P.2d at 736 (Rule 32.4(a) was amended "to address potential abuse by defendants caused
     by the old rule's unlimited filing periods"); *see also Wagner v. Stewart,* 2008 WL 169639,
27   *9 (D.Ariz. Jan. 16, 2008).

28

likely true than not or that its truth is highly probable. In criminal cases such as this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases, the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that he's not guilty, you must give him the benefit of the doubt and find him not guilty.

(Answer, Ex. J, pp. 17-18).  The pertinent portion of Petitioner's requested jury instruction on the "PRESUMPTION OF INNOCENCE-REASONABLE DOUBT" includes essentially the same language.[16]  (Answer, Exh. D).

The language used in the jury instruction is drawn from the reasonable doubt instruction adopted by the Arizona Supreme Court in *State v. Portillo,* 182 U.S. 592, 596 , 898 P.2d 970, 974 (1995).  "The Arizona Supreme Court has repeatedly reaffirmed the constitutionality of the *Portillo* instruction and mandated that trial courts give it."  *Ploof v. Ryan,* 2010 WL 5834801, *40 (D.Ariz. Sept. 2, 2010)(*citing State v. Orendain,* 188 Ariz. 54, 56, 932 P.2d 1325, 1327 (Ariz. 1997); *State v. Canez,* 202 Ariz. 133, 153, 42 P.3d 564, 584 (Ariz. 2002)),  *report and recommendation adopted,* 2011 WL 721629 (D. Ariz. Feb. 10, 2011).

Petitioner argued on direct appeal that the trial court erred in giving the *Portillo* reasonable doubt instruction and the trial court erred by allowing the prosecutor to use the "firmly convinced" language in closing arguments to characterize the State's burden. (*See* Petition, Exh. A (Petitioner's Brief on Direct Appeal, pp. 36-39); Petition, Exh. B, p.11). The Arizona Court of Appeals rejected Petitioner's claim as follows:

because [Petitioner] requested the court give the *Portillo* instruction, he invited any error in that instruction and is not entitled to appellate review of that issue.

---

[16]The difference in the quoted language between the court's version and Petitioner's version is that, three times, the court referred to the defendant as "him" or "he", and Petitioner's requested instruction instead stated: " the defendant."

1        *See State v. Logan,* 200 Ariz. 546, ¶9, 30 P.3d 631, 632 (2001).[17]

2    (Petitioner, Exh. B, p. 11).

3            Respondents argue that Petitioner's claim is barred from federal review by the

4    independent and adequate state ground doctrine which prohibits federal courts from

5    addressing habeas claims of state prisoners when a state-law default prevented the state court

6    from reaching the merits of the federal claim.  (Answer, p. 14 (*citing Thomas v. Lewis* 945

7    F.2d 1119, 1122 (9th Cir. 1991)); *see also Leavitt v. Arave,* 383 F.3d 809, 832-33 (9th Cir.

8    2004) (recognizing that the state court's decision applying the invited error doctrine may be

9    an independent state ground that would bar consideration of the issue on federal habeas

10   review).  On the instant record, Respondents are correct that the Arizona appellate court's

11   ruling was independent of the merits of the claim and an adequate basis for the state court's

12   decision.  *See Harris,* 489 U.S. at 260; *see also Meza v. Schroeder,* 2010 WL 1381095, *8

13   (D. Ariz. Mar. 9, 2010) (applying independent and adequate state ground doctrine where

14   state court ruled that the claimed errors were invited by petitioner).

15           Further, as Respondents point out, Petitioner cannot overcome this default because

16   he is unable to show cause and actual prejudice from the alleged constitutional violation.

17   (Answer, p.14).   Nor can he establish that this Court's failure to consider his claim on the

18   merits will result in a fundamental miscarriage of justice.  (*Id.*).  This is so because the state

19   court's use of the *Portillo* instruction is not contrary to, nor an unreasonable application of,

20   clearly established U.S. Supreme Court precedent.  "Although the Constitution does not

21   require jury instructions to contain any specific language, the instructions must convey both

22   that a defendant is presumed innocent until proven guilty and that he may only be convicted

23   upon a showing of proof beyond a reasonable doubt."  *Gibson v. Ortiz,* 387 F.3d 812, 821

24   (9th Cir. 2004)(*citing Victor v. Nebraska,* 511 U.S. 1, 4 (1994)), *overruled on other grounds

25   by Byrd v. Lewis,* 566 F.3d 855 (9th Cir. 2009).  *See also Victor,* 511 U.S.  at 5 (noting that

26

27           [17]*Logan* makes clear that the Arizona court has "repeatedly...held we will not find
     reversible error when the party complaining of it invited the error."  *Logan,* 200 Ariz. at 565-
28   566, 30 P.3d at 632-633 (citations omitted).

1    the Constitution does not require courts to define reasonable doubt "as a matter of course,"

2    and stating, "[s]o long as the court instructs the jury on the necessity that the defendant's

3    guilt be proved beyond a reasonable doubt,... the Constitution does not require that any

4    particular form of words be used in advising the jury on the government's burden of proof.")

5    (citations omitted)).

6        The Arizona Supreme Court, in *Portillo*, noted that the Federal Judicial Center

7    recommended the language at issue and that the instruction "most fairly and accurately

8    conveys the meaning of reasonable doubt...." *Portillo,* 182 Ariz. at 596, 898 P.2d at 974.

9    The Ninth Circuit has upheld the use of similar language. *See United States. v. Velasquez,*

10   980 F.2d 1275, 1278 (9th Cir. 1992); *United States v. Artero,* 121 F.3d 1256, 1257-59 (9th Cir.

11   1997). Moreover, Justice Ginsburg, in her concurring opinion in *Victor,* wrote:

12        This [model] instruction plainly informs the jurors that the prosecution must
          prove its case by more than a mere preponderance of the evidence, yet not
13        necessarily to an absolute certainty. The "firmly convinced" standard for
          conviction, repeated for emphasis, is further enhanced by the juxtaposed
14        prescription that the jury must acquit if there is a "real possibility" that the
          defendant is innocent. This model instruction surpasses others I have seen in
15        stating the reasonable doubt standard succinctly and comprehensibly.

16   *Victor,* 511 U.S. at 27 (Ginsburg, J., concurring). In sum, "the *Portillo* reasonable doubt

17   instruction given by the trial court does not violate any clearly established Supreme Court

18   authority." *Estrada v. Ryan,* 2010 WL 2991566, *13 (D. Ariz. July 26, 2010) (*citing Lopez

19   v. Ryan,* 2009 WL 3294876, *1 (D.Ariz. Oct. 14, 2009)). *See also Ploof,* 2011 WL 587961

20   at *10-*12. Consequently, Petitioner's claim regarding the *Portillo* instruction is

21   procedurally defaulted and should be dismissed.

22            4.    Recommendation

23       The Magistrate Judge recommends that the District Court: (1) deny on the merits

24   Petitioner's claim that his due process rights were violated by the trial court's refusal to give

25   the spousal defense instruction; and (2) dismiss as procedurally defaulted Petitioner's claims

26   that: (a) the trial court violated his due process rights by granting defense counsel's request

27   to omit instruction regarding the dismissed charge; and (b) the trial court violated his due

28   process rights by giving the *Portillo* instruction.

**IV.    CONCLUSION**

The Petition for Writ of Habeas Corpus should be dismissed in part and denied in part.

**V.     RECOMMENDATION**

For the foregoing reasons, the Magistrate recommends that the District Court dismiss in part and deny in part Petitioner's Petition for Writ of Habeas Corpus.  (Doc. No. 1) as follows:

    1.    The Petition should be dismissed as procedurally defaulted with regard to:

        a.    Ground II Sub-claim 2 that the trial court violated Petitioner's due process rights by granting defense counsel's request to omit instruction regarding Count Two which was dismissed; and

        b.    Ground II Sub-claim 3 that the trial court violated Petitioner's due process rights by giving the *Portillo* instruction.

    2.    The Petition should be denied on the merits with regard to:

        a.    Ground I; and

        b.    Ground II Sub-claim 1 regarding the trial court's refusal to give the spousal defense instruction.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed.R.Civ.P. 72(b); *see also* LRCiv 7.2(e)(3) (10-page limit for objections).  If objections are filed, then the parties should use the following case number: **CV 09-425-TUC-FRZ.** Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to *de novo* review of the issues.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*)., *cert. denied,* 540 U.S. 900 (2003).

DATED this 25th day of May, 2011.

_____
Héctor C. Estrada
United States Magistrate Judge